FILED

2026 Jul-30  AM 10:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **ALYSSA VERHAGE,** *et al.*, | |
| **Plaintiffs**, | |
| **v.** | **Case No. 5:25-cv-335-HDM** |
| **POWERGRID SERVICES LLC,** *et al.*, | |
| **Defendants**. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Alyssa Verhage and Koleen Morgan sue Defendants PowerGrid Services LLC ("PowerGrid") and Mid-Con Energy Services Inc. ("Mid-Con") for failure to pay bonuses they allegedly earned during their employment with Mid-Con. (Doc. 1). Plaintiffs assert claims for breach of contract, fraudulent misrepresentation, work and labor performed, and unjust enrichment against Defendants. *Id.* This case is before the court on Defendants' fully-briefed motion for summary judgment, (docs. 24, 31, 34), which, with the benefit of oral argument, the court **GRANTS** for the reasons stated below.

## BACKGROUND

PowerGrid acquired Mid-Con, an electrical infrastructure and storm restoration contractor, before Plaintiffs became employed in the relevant business

development roles. (Doc. 25, ¶¶ 1–2). In late 2023 or early 2024, Plaintiffs spoke with Mid-Con's then-President, Bobby Garrett, and then-Vice-President, Belinda Jones, about the possibility of working for Mid-Con. *Id.*, ¶ 9. On February 3, 2024, Jones emailed Plaintiffs virtually identical offer letters, which had been drafted by Jones with the input of PowerGrid's Chief Financial Officer, Andrew Gay, and signed by Garrett. *Id.*, ¶¶ 10–11. The offer letters state that Plaintiffs would each receive, alongside their salaries, an "[a]nnual 0.006% Bonus Structure of Mid-Con profits, minus direct overhead costs." *Id.*, ¶ 21. Jones wrote in the email, "I know you will have questions on . . . the bonus structure, I am sure you will want numbers to put to this. I can give you some examples and we can talk it over next week in more detail." (Doc. 31, ¶ B(1)).

After Plaintiffs received the offer letters, they attended a Zoom meeting with Jones and Garrett to discuss the offers. (Doc. 25, ¶ 15). During this meeting, Jones represented that Plaintiffs' bonus payments would be paid quarterly and calculated at "0.006 times the profits minus the overhead costs" of Mid-Con. *Id.*, ¶ 16. According to Plaintiffs, Jones also provided them with example bonus amounts in the tens and hundreds of thousands of dollars, which she arrived at by multiplying 0.006, or 0.6%, by Mid-Con's profits from multiple quarters in 2023. *Id.*, ¶ 17. Jones testified that she offered Plaintiffs examples of the bonus amounts that she had personally received in the past—quarterly bonuses equaling sixty thousand dollars,

eighty thousand dollars, and in some quarters, exceeding two hundred thousand dollars, (doc. 31, ¶ B(3))—not to show them how much they could make, but to set an expectation for how Mid-Con "would treat them," (doc. 25, ¶ 19).

Mid-Con did not impose a deadline to accept their offer of employment, (doc. 25, ¶ 29), but after the meeting, Plaintiffs both signed their offer letters, *id.*, ¶ 20, which provided for an "Annual 0.006% Bonus Structure," (doc. 23-1 at 53; doc. 23-2 at 57). Plaintiffs admit they reviewed the offer letters before the Zoom meeting and again before signing the letters. (Doc. 25, ¶ 25). Verhage testified that she noticed the percentage sign in the offer letter—0.006%—but did not recognize that this would result in a different calculation method from the one presented by Jones. (Doc. 23-1 at 30). Morgan testified that when she read and signed her offer letter, she simply assumed that 0.006% was the same as 0.006 based on Jones's representation in the Zoom meeting. (Doc. 25, ¶ 28). But both Plaintiffs understand that 0.006% converts to 0.00006 when calculating 0.006% of a given number and when inputted into a calculator. *Id.*, ¶ 30. No one at Mid-Con discussed a bonus forfeiture policy with Plaintiffs, *id.*, ¶ 33, (doc. 31, ¶ 33), nor was one referenced in their offer letters, (doc. 23-1 at 53; doc. 23-2 at 57). (*See also* Doc. 25, ¶ 43). Indeed, Defendants do not have any written policy or procedure allowing forfeiture of earned bonuses if the employee resigns before contract bonuses are paid. (Doc. 31, ¶ B(6)).

Jones, when asked in deposition to perform the usual bonus calculation, multiplied Mid-Con's profits (minus direct overhead costs) by 0.006 rather than by 0.006%, which would be 0.00006. (Doc. 23-5 at 35). She testified that what she meant when referring to an "Annual Bonus Structure" in the written agreement was that "the calculation for the year would [remain] . . . in that form," *id.* at 30, which Plaintiffs take to mean that the profit percentage being offered was annual and would not change for the entire year, as opposed to changing quarterly, (doc. 31, ¶ B(5)). When questioned, Jones admitted that the wording of the contract was a "lesson learned" and that it should have been "worded differently" to promote clarity. (Doc. 23-5 at 30).

Gay testified that he intended to agree, on behalf of Mid-Con, to "[a]nnual" bonuses that were calculated at "0.006%" of Mid-Con's "profits, minus direct overhead costs," just as the offer letters describe, (doc. 25, ¶ 12), and he described Plaintiffs' bonus offers as a "floor of 0.006%" that "protects the company" because describing a "very low number" for the bonus "leaves discretion . . . to pay more," *id.*, ¶ 13. Gay also testified that Mid-Con intentionally described an "[a]nnual" bonus because committing to an "[a]nnual" bonus affords the company the "opportunity [if necessary] to do a true-up" of its financials based upon an external year-end audit of its "profits" from January 1 to December 31 of each year. (Doc. 25, ¶ 14).

4

Plaintiffs began their business development positions with Mid-Con on March 25, 2024, and voluntarily resigned in writing on September 12, 2024. *Id.*; (Doc. 25, ¶¶ 35–36). In their resignation letters, both Plaintiffs demanded payment of bonuses they believed due to them for the second and third quarters of 2024, stating that "[p]er the agreed upon offer letter, bonuses are paid out at 0.006% of profits minus overhead costs." (Doc. 25, ¶ 37). Plaintiffs received biweekly salary payments based on their gross annual salaries of $160,000, beginning on March 25, 2024, and ending on September 26, 2024, fourteen days after they gave notice of their resignation. *Id.*, at 39–40. Plaintiffs were paid first-quarter bonuses—calculated by multiplying 0.006, not 0.006%, by net profits—of $7,606.71 for their one week of work in the first quarter. (Doc. 31, ¶ B(8)).

Mid-Con calculated and made bonus payments to employees for the second and third quarters of 2024 after Plaintiffs voluntarily resigned. (Doc. 25, ¶ 41). Mid-Con did not pay Plaintiffs a bonus for those quarters. *Id.*, ¶ 45. Plaintiffs allege their bonuses for quarters two and three, using the 0.6% calculation method used for quarter one, would have amounted to a total of $212,821.82 for each Plaintiff. (Doc. 31, ¶ B(14)). Using the 0.006% bonus calculation specified in the contract, Plaintiffs allege that each Plaintiff would have received a bonus of $2,128.82. *Id.*, ¶ B(15).

The day that Plaintiffs resigned, Mike Douglas was installed as the new President of Mid-Con. *Id.*, ¶ B(16). After their resignations, Douglas texted Plaintiffs

and said he was "told the Q2 bonuses were approved Friday and will be paid out next week." (Doc. 35, ¶ 19; Doc. 31, ¶ B(19)). After Plaintiffs followed up with Douglas, he told Verhage, "[y]ou know I'm going to keep working for you and [Morgan] to get what is yours." (Doc. 23-7 at 59). On January 15, 2025, some four months after Plaintiffs voluntarily resigned their employment with Mid-Con, Morgan texted Douglas to inquire about payment of their bonuses, and Douglas replied, "I am actually meeting with executive leadership in Florida on Monday and Tuesday of next week. I will work with them to see if we can get this resolved." (Doc. 31, ¶ B(21)). Defendants never paid Plaintiffs second- or third-quarter bonuses. (Doc. 31-7 at 23). Douglas testified that, in his opinion, Defendants withheld the bonuses because Plaintiffs went to work for a competitor. *Id.*

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether the movant has met this burden, courts must view the evidence in the light most favorable to the non-movant." *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). A genuine dispute of material fact exists when "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment always bears the initial

6

burden of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

Plaintiffs bring four claims against Defendants: breach of contract (Count I), fraudulent misrepresentation (Count II), work and labor performed (Count III), and unjust enrichment (Count IV).[1] Defendants moved for summary judgment on all four counts, (doc. 24), which, for the reasons explained below, is due to be granted in full.

### I.    Breach of Contract (Count I)

Plaintiffs first sue Defendants for breach of contract for the failure to pay bonuses from the second and third quarters of 2024. Plaintiffs argue (1) that their employment contracts are ambiguous; (2) that extrinsic evidence creates a genuine dispute of material fact as to whether the bonuses were due quarterly or annually; and (3) that extrinsic evidence creates a genuine dispute of material fact as to whether the bonuses should be calculated using a 0.006 multiplier or at 0.006% percent.    Defendants    respond    that    (1)    Plaintiffs'    employment    contracts

---

[1] The court will analyze these claims under Alabama law because "[a] federal court sitting in diversity jurisdiction applies the substantive law of the forum state, which, in this case, is Alabama." *J & M Assocs., Inc. v. Romero*, 488 F. App'x 373, 376 (11th Cir. 2012) (per curiam) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938)).

7

unambiguously provide for annual bonuses and thus that extrinsic evidence may not be considered; (2) because Plaintiffs resigned before the end of the contractual term (i.e., the year), they are not entitled to any bonus; and (3) under the plain language of the employment contract, Plaintiffs were only entitled to bonuses based on a 0.006 multiplier but that the point is moot because Plaintiffs forfeited any bonuses by resigning.

The court agrees with Defendants and finds that (1) the contracts as written are unambiguous and thus that extrinsic evidence cannot introduce a dispute of material fact, and (2) as a matter of law, in the absence of a contractual provision providing otherwise, Plaintiffs are not entitled to bonuses payable after their voluntary resignation.

### A. The contracts as written are unambiguous, and thus extrinsic evidence cannot introduce a genuine dispute of material fact.

It is well settled that a written contract that contains a merger clause—a clause in which the parties expressly agree that the written contract "cover[s] the entire transaction"—is presumed to be fully integrated. *Motley v. Express Servs., Inc.*, 386 So. 3d 766, 772 (Ala. 2023). It is likewise well settled that the parol-evidence rule applies to fully integrated contracts. *Id.* The parol evidence rule provides that, absent an exception, "a party to an unambiguous written contract cannot offer parol, or extrinsic, evidence of prior or contemporaneous oral agreements to change, alter, or contradict the terms of the contract." *Id.* at 771–72. Rather, the court must "enforce

an unambiguous, lawful contract as it is written." *Ala. Plating Tech., LLC v. Ga. Plating Tech., LLC*, 411 So. 3d 335, 348–49 (Ala. 2024), *reh'g denied* (Aug. 23, 2024).

Here, it is undisputed that each Plaintiff's offer letters contained the same provision stating, "[t]his letter and the documents specifically referenced herein form the complete and exclusive statement of employment between you and the Company. These employment terms supersede any other agreements, understandings, promises, or communications, written or oral, by or on behalf of the Company." (Doc. 23-1 at 53; Doc. 23-2 at 57). This contract provision constitutes a clear merger clause, and, accordingly, absent an ambiguity or an exception, the parol evidence rule applies and only the text of Plaintiffs' materially identical offer letters may be considered. Their "construction and legal effect will be based upon what is found within the four corners of the instrument." *Ala. Plating Tech., LLC*, 411 So. 3d at 349.

The parol evidence rule contains three exceptions to its general exclusionary principle: fraud, mistake, and illegality. Plaintiffs do not argue mistake. Indeed, in their response brief, they state explicitly that the language in contention "was not a mistake and it was not a typo. . . . Looking at these identical contracts together, Ms. Jones did not make a mistake. Instead, the contracts at issue here contain latent ambiguities as a matter of law." (Doc. 31 at 33). Nor do Plaintiffs argue illegality.

9

While they do argue in Count II that there was fraud, the court, as discussed *infra*, disagrees. And, regardless, Plaintiffs do not argue that this alleged fraud requires the court to consider parol evidence. Instead, Plaintiffs argue exclusively that parol evidence should be considered on the basis of contractual ambiguity.

A court may not find a contractual term "ambiguous simply because the parties assign different meanings to it." *Cain v. Saunders*, 813 So. 2d 891, 894 (Ala. Civ. App. 2001). Nor does a contract or term become ambiguous merely because the contract does not define a word or phrase or because a word or phrase can be used in different ways or different contexts. *Old Town II, LLC v. Oppidan Holdings, LLC*, No. 5:20-cv-1023, 2021 WL 2586813, at *12 (N.D. Ala. Mar. 8, 2021). Instead, "[w]ritten contracts must be read, considered, and construed in their entirety; from the whole of the contract, every word, every sentence must be looked at on the subject to gather the intent of the parties." *City of Albany v. Spragins*, 93 So. 803, 810 (Ala. 1922). "Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning." *Lewis v. Oakley*, 847 So. 2d 307, 327 (Ala. 2002). If, applying all of these principles, a court determines that the terms of a contract are "susceptible of only one reasonable meaning," then the contract is unambiguous and "the court will presume that the parties intended what they stated and will enforce the contract as

10

written." *Ex parte Triad of Ala., LLC*, No. SC-2024-673, 2025 WL 877735, at *5 (Ala. Mar. 21, 2025).

There are two types of contractual ambiguities: patent and latent. *Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 490 (Ala. 2020). Plaintiffs do not argue that the language of the contract presents a patent ambiguity, meaning one that is obvious on the face of the document, *see Int'l Paper Co. v. Madison Oslin, Inc.*, 985 So. 2d 879, 884 (Ala. 2007), and the court agrees that none exists. Rather, Plaintiffs argue that the language of their employment contracts contains a latent ambiguity.

A latent ambiguity exists in contractual language that might read "quite clearly but that nonetheless reasonably lends itself to conflicting constructions in a particular case." *Ware v. Columbus Life Ins. Co.*, 640 F. Supp. 3d 1196, 1206 (N.D. Ala. 2022). Put differently, a latent ambiguity exists when "a word, thought to have but one meaning" when the parties executed the contract, "actually has two or more meanings" in light of some previously unknown "extrinsic or collateral evidence." *Meyer v. Meyer*, 952 So. 2d 384, 392 (Ala. Civ. App. 2006). In *Ware*, the court explained latent ambiguities using the "classic first-year law school case[] . . . *Raffles v. Wichelhaus*," in which the parties contracted for the shipment of cotton by way of the ship "Peerless" but later discovered that two ships bore that name. *Ware*, 640 F. Supp. 3d at 1206 n.49. This created a latent ambiguity as to which ship the parties contracted for use of, requiring the use of extrinsic evidence to ascertain the answer.

11

*Id.* Several other cases are similarly illustrative. *See, e.g.*, *Har-Mar Collisions, Inc. v. Scottsdale Ins. Co.*, 212 So. 3d 892, 907 (Ala. 2016) (Murdock, J., concurring) (noting that where "Har-Mar, Inc.," was named in the contract, but no such company existed, extrinsic evidence could be allowed in on the basis of latent ambiguity because the words themselves created one perfectly clear meaning that, in application, could not be correct); *Greene v. Hanover Ins. Co.*, 700 So. 2d 1354, 1356 (Ala. 1997) (finding a latent ambiguity where a contract used the name "James Scott Vance" but the uncontested evidence showed that it was intended to use the name "Scott James Vance"); *Campbell v. Carl*, 395 So. 2d 480, 483 (Ala. 1981) (finding a latent ambiguity "to the extent only that [a] property description[] may apply to either of two pieces" of property).

As is shown by the examples given above, a latent ambiguity arises when facially clear language becomes uncertain when applied to outside facts—typically because the language either fits no existing person, thing, or circumstance exactly, *see, e.g.*, *Har-Mar Collisions, Inc.*, 212 So. 3d at 907, or fits more than one, even though the contract plainly contemplates a single application, *see, e.g.*, *Campbell*, 395 So. 2d at 483. A latent ambiguity is *not* established by evidence that a party understood, intended, or performed a contract differently from its written terms, which are, themselves, fully performable as written. *See Wayne J. Griffin Elec., Inc. v. Dunn Constr. Co.*, 622 So. 2d 314, 317 (Ala. 1993) ("The mere fact that the parties

12

argue different constructions of the document does not force the conclusion that the disputed language is ambiguous."); *Gore v. White*, 96 So. 3d 834, 842 (Ala. Civ. App. 2012) ("Although the record supports the conclusion that the former husband and the former wife had different interpretations of the word 'consult,' such a conclusion does not render paragraph five of the modification judgment latently ambiguous.").

Here, the Plaintiffs' offer letters state that they would receive an "[a]nnual 0.006% Bonus Structure of Mid-Con profits, minus direct overhead costs." (Doc. 25, ¶ 21). Defendants argue that, under a plain reading of this provision, Plaintiffs were unambiguously entitled to a bonus equaling 0.006% of annual profits minus direct overhead costs. (Doc. 25 at 17–18). Because annual profits are calculated at the end of the year, Defendants argue that Plaintiffs were entitled to one bonus at the end of the year. *Id.* Plaintiffs, on the other hand, argue that the word "annual" does not refer to the bonus itself, but rather indicates that the percentage rate cannot change for a year—i.e., the *percentage rate* is annual. (Doc. 31 at 31–32). Plaintiffs argue that these conflicting interpretations indicate a latent ambiguity, thus opening the door for consideration of extrinsic evidence, which, they claim, shows that Plaintiffs were owed quarterly bonuses at a rate of 0.6%.

The court agrees with Defendants. The essence of Plaintiffs' argument is that once extrinsic evidence is considered, it becomes clear that what the contract says is

not what the drafter intended, and thus that there must be a latent ambiguity. But Defendants' understanding of the sentence is the natural one, and the contract is clear and enforceable as written, even if its unambiguous meaning—that Plaintiffs are entitled to an annual bonus at a rate of 0.006%—does not align with Jones's intent or Plaintiffs' understanding. Such is the province of mistake and reformation, not ambiguity. *See Orkin Exterminating Co., Inc. v. F.T.C.,* 849 F.2d 1354, 1362 (11th Cir. 1988) (explaining that "[n]o latent ambiguity exists unless the contract is actually susceptible to the meaning contended for by a party" and rejecting an unreasonable interpretation of a written contract). Plaintiffs' evidence does not reveal two objectively possible meanings of "[a]nnual 0.006% Bonus Structure," nor does it show that those terms have no objectively possible meaning. *See LePage v. Ctr. for Reprod. Med., P.C.*, 408 So. 3d 678, 684 (Ala. 2024) ("There is simply no patent or latent ambiguity in the word 'child'; it is not a term of art and contains no inherent uncertainty.") (internal quotation marks omitted). In other words, Plaintiffs' proffered external evidence does not show that the contract cannot, due to some latent ambiguity, be applied without the benefit of external evidence. Rather, it seeks to show that Mid-Con allegedly promised or practiced something different from the integrated written offer letters. That evidence cannot create a latent ambiguity.

In sum, Plaintiffs' employment contracts unambiguously provide that—during their employment with Mid-Con—they were entitled to an annual, i.e.,

14

*yearly*, bonus. Under the parol evidence rule, no extrinsic evidence is allowed to introduce a genuine dispute of material fact about the meaning of that provision.

### B. Plaintiffs are not entitled to bonuses payable after their voluntary resignation.

Having determined that Plaintiffs were, during their employment with Mid-Con, entitled only to annual bonuses, the court must now decide whether, in the absence of a contractual provision addressing the issue, Plaintiffs are entitled to prorated bonuses payable after their voluntary resignation. There does not appear to be binding precedent on this issue.[2] This court holds that Plaintiffs are not.

Plaintiffs argue that the absence of an express forfeiture provision renders the contracts ambiguous. (Doc. 38 at 3–10). They argue that the court may therefore consider all record evidence concerning the parties' intent and payment practices, and that any unresolved factual disputes must be decided by a jury. *Id.* They primarily rely on two cases to support this argument: *American Security Life Insurance Company v. Moore*, 72 So. 2d 132 (Ala. Ct. App. 1954), and the case on which *Moore* primarily relies, *Coleman v. Graybar*, 195 F. 2d 374 (5th Cir. 1952).

---

[2] Precedent on payment of commissions is inapplicable here. A commission is "[a] fee paid to an . . . employee for a *particular* transaction, [usually] as a percentage of the money received *from the transaction*," *Commission*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added), and is thus distinguishable from a bonus. Accordingly, this case is factually distinguishable from those on post-resignation payment of commissions earned pre-resignation. *See Tangen v. IdeaCom of the Gulf Coast, Inc.*, 590 F. App'x. 836 (11th Cir. 2014) (per curiam) (applying Alabama law and affirming judgment in favor of employee for commissions earned during employment but payable after resignation because there was no express forfeiture clause).

In *Moore*, an employment contract required the plaintiff-employee to remain employed with the defendant-company until December 15 to receive a bonus. 72 So. 2d at 133. The plaintiff was fired in late November, and the defendant refused to pay him a prorated bonus. *Id.* The Alabama Court of Appeals[3] held that,

> [I]n the absence of special provisions in the contract, . . . if the employment[] is terminated by mutual consent of the parties or by the act of the employer through no fault of the employee, the latter should be entitled to a proportionate share of the bonus, according to the time served . . . .

*Id.* at 134.

In *Coleman*, the plaintiff-employee accepted a job as a salesman with the defendant-employer under the terms of a salary comprised of wages and other yearly payments that had characteristics both of commissions and of bonuses and which the court dubbed sales commissions. 195 F.2d at 375. The plaintiff was fired without cause after earning commissions but before being paid those commissions. *Id.* The plaintiff sued to recover the unpaid commissions. *Id.* The defendant argued that an explicit forfeiture provision in the employment contract precluded recovery. *Id.* at 376. The court rejected the defendant's arguments on the basis of the specific wording of the forfeiture provision, holding that the commissions could not be

---

[3] The Alabama Court of Civil Appeals was not created until 1969. Ala. Acts 1969, Act No. 987, p. 1744, § 3.

forfeited upon the employee's termination absent a clear provision demonstrating that that was the parties' intent. *Id.* at 378–79.

Plaintiffs emphasize the *Moore* court's statement that, absent special contractual provisions, an employee whose employment ends by mutual agreement or through the employer's act without the employee's fault may recover a proportionate bonus. And Plaintiffs read *Coleman* as requiring express and precise language before an employer may treat a bonus as forfeited. Both of these cases, however, can be easily distinguished from the one before the court.

*Moore* and *Coleman* both involve post-*termination* bonuses, while the case at bar involves a post-*resignation* bonus. Indeed, the Alabama Supreme Court itself has recognized that *Moore* applies "when a contract is terminated by an employer through no fault of the employee." *See Amoco Fabrics & Fibers Co. v. Hilson*, 669 So. 2d 832, 835 (Ala. 1995). This is not a novel concept, for while there is no binding authority on the issue of post-resignation bonuses, "[t]here is much authority that where an agreement provides for a bonus for continuous service which is terminated by the employer through no fault of the employee, the latter is entitled to a proportionate share of the bonus according to the time served." *Kollman v. McGregor*, 39 N.W.2d 302, 304–05 (Iowa 1949). *See also Amoco Fabrics & Fibers Co.*, 669 So. 2d at 835 ("[W]hen a contract is terminated by an employer through no fault of the employee, then in the absence of a special forfeiture provision the

17

employee is entitled to a proportionate share of the bonus according to time served.").

"Where, however, the employee voluntarily quits or is discharged for a reason attributable to his own fault, there is no right to recover any part of the bonus." *Kollman*, 39 N.W.2d at 304–05 (collecting cases). Other courts considering this question have likewise concluded that, where the contract is silent on the subject, an employee who resigns before the end of an annual bonus period forfeits any entitlement to the bonus. *See Pick v. Norfolk Anesthesia, P.C.*, 755 N.W.2d 382, 388 (Neb. 2008) (explaining that it is a "commonsense notion that absent an express agreement otherwise, an employee ordinarily forfeits the right to receive a bonus by resigning before the corresponding bonus period ends"); *Harwood v. Avaya Corp.*, No. C2-05-828, 2007 WL 1574116, at *6 (S.D. Ohio May 25, 2007) (explaining that "an employee bonus plan by which the employer offers to pay a bonus based upon the company's annual net profit" creates "a contractual obligation on the part of the employer" that is intended "to induce workers 'not to quit hastily and before the expiration of the year'" and is "forfeited if [the employee] voluntarily quit[s]"); *Snair v. City of Clearwater*, 817 F. Supp. 108, 113 (M.D. Fla. 1993) ("[W]hen an employee voluntarily leaves his place of employment prior to the time that a bonus or a share of profits was to be distributed under a general plan, an employee cannot recover."); *Kassab v. Ragnar Benson, Inc.*, 254 F. Supp. 830, 833 (W.D. Pa. 1966)

18

("In most of the cases in which an employee has left his employment voluntarily prior to the time that a bonus or a share of profits was to be distributed under a general plan, it has been held that the employee could not recover."). *See also* 2 Corbin, Contracts § 6.2 (rev. ed. 1995) (noting that "the bonus is not fully earned until the service has continued for the full time").

This distinction between resignation and termination is logical. If, even in the absence of an agreed-upon forfeiture provision, an employer could deny employees their bonuses by unilaterally terminating them without cause right before their bonuses came due, many, if not most, contractual obligations to pay employee bonuses would be rendered meaningless. Post-*resignation* bonus forfeiture does not raise the same concerns, as the power to earn or forfeit the bonus rests with the employees, who themselves may weigh the costs and benefits of resignation, not with the employer. Accordingly, this court joins the near-unanimous body of authority cited *supra* in holding that, absent a contractual provision to the contrary, an employee who voluntarily resigns before the end of a bonus term is not entitled to payment of a prorated bonus for work previously performed.

Because, under their unambiguous employment contracts, Plaintiffs were entitled only to annual bonuses, and because Plaintiffs forfeited those bonuses when they voluntarily resigned before the end of the year, Plaintiffs are, as a matter of law,

19

not entitled to any recovery for breach of contract. Accordingly, Defendants' motion for summary judgment is due to be granted as to Count I.

## II.     Fraudulent Misrepresentation (Count II)

Plaintiffs next sue Defendants for fraudulent misrepresentation. A misrepresentation amounts to fraud when "one party misrepresented a material fact concerning the subject matter of the underlying transaction and the other party relied on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." *Brickhouse Cap., LLC v. Coastal Cryo AL, LLC*, 393 So. 3d 467, 473–74 (Ala. 2023) (alterations accepted and internal quotation marks omitted). "However, it is not enough for the party claiming fraud to simply show that there was a misrepresentation upon which he or she relied. Rather, the party claiming fraud must also demonstrate that his or her reliance on the misrepresentation was reasonable." *Id.* at 474 (citations omitted). The Alabama Supreme Court has repeatedly affirmed that a plaintiff "who is capable of reading documents, but who does not read them or investigate facts that should provoke inquiry, has not reasonably relied upon a defendant's oral representations that contradict the written terms in the documents." *Id.* As it explained in *Alfa Life Insurance Corp. v. Colza*,

> We do not think it unreasonable to conclude as a matter of law that, in this day and age, any adult of sound mind capable of executing a contract necessarily has a conscious appreciation of the risk associated

20

with ignoring documents containing essential terms and conditions related to the transaction that is the subject of the contract.

159 So. 3d 1240, 1252 (Ala. 2014). In other words, a fraud claim fails as a matter of law when an executed contract contradicts the alleged misrepresentations. *Brickhouse Cap., LLC*, 393 So. 3d at 474.

Here, Plaintiffs' claims for fraudulent misrepresentation arise from alleged affirmative statements made by Jones before Plaintiffs signed their offer letters that their bonuses would be (1) paid quarterly, the month after the end of each quarter, and (2) calculated by multiplying "Mid-Con profits, minus overhead costs," by 0.006 (not 0.006%). (Doc. 1 at 5–7). However, it is undisputed that Plaintiffs had the offer letters before their meeting with Jones at which she allegedly made those statements. (Doc. 25, ¶ 25). Each Plaintiff read her offer letter before the meeting and then had the opportunity to read it again before signing it, with no deadline for acceptance. *Id.* And each alleged misrepresentation by Jones was directly contradicted by the offer letters, which unambiguously described an "annual" bonus calculated at 0.006%. *See* Section I(A), *supra*.

Because the oral representations that form the foundation of Plaintiffs' claim are directly contradicted by the contracts themselves, Plaintiffs cannot, under Alabama law, satisfy the reasonable reliance requirement of a fraudulent misrepresentation claim. Accordingly, Defendants' motion for summary judgment is due to be granted as to Count II.

21

### III. Work and Labor Performed and Unjust Enrichment (Counts III and IV)

Plaintiffs concede that if the court finds the written contracts enforceable—which it does, *see* Section I, *supra*—their work and labor performed and unjust enrichment claims fail, (doc. 31 at 42–43). *See also Rhyne v. Martin*, 290 So. 2d 650, 652 (Ala. 1974) (holding that a plaintiff may have a cognizable claim for work and labor performed only if there is not an "express contract between the parties for the services"); *Univalor Tr., SA v. Columbia Petroleum, LLC*, 315 F.R.D. 374, 382 (S.D. Ala. 2016) ("[T]he existence of an express contract extinguishes an unjust enrichment claim altogether because unjust enrichment is an equitable remedy which issues only where there is no adequate remedy at law.") (citing *Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006)). Accordingly, Defendants' motion for summary judgment is due to be granted as to Counts III and IV.[4]

### CONCLUSION

For the reasons stated herein, the court **GRANTS** Defendants' motion for summary judgment, (doc. 24), and **DISMISSES** this action **WITH PREJUDICE**. A separate judgment will be issued along with this opinion.

---

[4] Because Plaintiffs have not established an underlying breach of contract or actionable misrepresentation, the court need not decide whether PowerGrid could otherwise be held liable as Mid-Con's alter ego or principal.

**DONE** and **ORDERED** on July 30, 2026.

**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE